**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| LISA WASHINGTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-02565-E |
| | § | |
| EDWARDS LIFESCIENCES LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court are two motions for summary judgment. First, Plaintiff Lisa Washington's Motion for Partial Summary Judgment seeks affirmative summary judgment on her Title VII claims of (i) failure to accommodate religious observance and (ii) religious discrimination. (ECF No. 38). Second, Defendant Edwards Lifesciences LLC's (Edwards)'s Traditional and No Evidence Motion for Summary Judgment seeks summary judgment dismissal of all of Washington's claims. (ECF No. 67). Additionally, the Parties have filed various ancillary motions that relate to these motions for summary judgment. Washington has moved for oral argument on her Motion for Partial Summary Judgment. (ECF No. 45). The Parties have filed various motions to strike based on (i) computation of time for filings[1] and (ii) summary judgment evidence objections. (ECF Nos. 56; 70; 76; 84). Edwards has sought leave to file sur-reply on Washington's Motion for Partial Summary Judgment. (ECF Nos. 59; 62; 63).

---

[1] Federal Rule of Civil Procedure 6 enumerates the methods of computing time for filing motions. *See generally* Fed. R. Civ. P. 6.

After considering the Parties' briefing, appendices, and applicable law, the Court reaches the following adjudications. For the reasons hereunder, the Court:

1.  DENIES Washington's Motion for Partial Summary Judgment, (ECF No. 38);

2.  GRANTS Edwards Lifesciences's Traditional and No Evidence Motion for Summary Judgment, (ECF No. 67);

3.  DENIES Washington's motion for oral argument, (ECF No. 45);

4.  DENIES Washington's motion to strike Edwards's motion for summary judgment based on computation of time, (ECF No. 70);

5.  DENIES each motion to strike summary judgment evidence as moot, (ECF Nos. 56; 76; 84);

6.  DENIES each motion to file sur-reply as moot, (ECF Nos. 59; 62; 63).

## I. BACKGROUND

### A. Edwards and Washington

Edwards is a company that sells, *inter alia*, surgical heart valves. (ECF No. 69 at 20-23). In 2001, Edwards hired Washington to sell surgical heart valves, tissue valves, mitral, and tricuspid repair rings. (ECF No. 69 at 11-12, 19-21). Washington's job title changed over time, but her primary job duty was to promote the sale of these medical devices. (ECF No. 69 at 11-12, 19-21).[2] Washington was responsible for: (i) identifying "growth opportunities" for Edwards; (ii) meeting sales quotas; (iii) launching new products; (iv) developing business opportunities; (v) continuing adoption of products with customers; and (vi) educating surgeons and hospital staff on the safe and effective use of Edwards's products. (ECF No. 21-26).

---

[2] This is the first-filed of two employment cases that involve a plaintiff that sold medical devices for Edwards. *See Stark v. Edwards Lifesciences LLC*, No. 3:22-CV-02579-E.

Washington's job description did not specify how or where these tasks are to be completed—whether in-hospital or outside-hospital. (ECF No. 69 at 94). Edwards required its salespersons—including Washington—to meet with customers both outside and inside hospital settings. (ECF No. 69 at 136-42). Washington communicated with surgeons by phone and text. (ECF No. 69 at 28). Washington presented products to surgeons one-on-one—either in their offices or in the operating room. (ECF No. 28-29). For educating hospital staff, Washington set up "in[-]service" meetings, which occurred inside and outside of the customer hospitals. (ECF No. 69 at 26-28). Washington hosted lectures outside of the customer hospitals. (ECF No. 69 at 26-28, 60).

## B. Edwards and COVID-19 Mandates

In summer and fall of 2021, a new variant of COVID-19—the Delta variant—circulated throughout the United States. (ECF No. 69 at 108, 119-20, 123).[3] Edwards's Senior Vice President for Global Employee Health Dr. Tista Ghosh determined that this:

> Delta variant was causing more severe illness, particularly among the types of high-risk patients that Edwards treats. In addition, the Delta variant was found in a July 2021 study to be more contagious, reducing exposure time necessary to spread infection from minutes to seconds. In addition, an August 2021 study found that people had double the hospitalization risk with Delta than they did with the previously dominant variant.

(ECF No. 69 at 119). In response, Edwards implemented COVID-19 mandates for its employees, which involved vaccination or testing. Ghosh testified during her deposition that:

> We have the highest risk patients, and they all were at risk of potentially dying from COVID at that point. So we made this policy for people who potentially interacted with patients or went into hospital facilities, because our goal was to protect patients at that time.
> [. . .]
> [][D]uring that timeframe, we were still learning about a new variant called the delta variant[,] which had just come out that summer. And it was different. It was

---

[3] *See generally Alabama Ass'n of Realtors v. Dep't of Health & Human Services*, 594 U.S. 758, 772 (2021) (Breyer, J., dissenting) (discussing that the "Delta variant is more than 2x as contagious as previous variants" and may "cause more severe illness than previous strains in unvaccinated persons") (internal quotation omitted).

very different from the previous variants. *And it was more contagious we were learning. We didn't have a full picture at this point.*
[. . . .]
Around September, we still didn't have full data. Every day was different with -- with COVID at that point. We were getting so much new information every day.
[. . . .]
*But at that point, we believed we were doing our best to protect our patients by [. . .] asking everyone to be vaccinated if they were going into patient types of settings.* But if they couldn't be vaccinated because of a religious exemption, for example, we put in extra safety measures. *So we asked people to test twice a week by PCR, which is the gold standard, highest accuracy test for COVID.* And wear an N-95 mask when going into these, you know, patient-related spaces in order to both accommodate the religious or medical exemption and keep our patients as safe as possible, because that was our number one goal.

(ECF No. 69 at 108-09) (emphasis added). Edwards implemented two mandates for its employees—the First Mandate and the Second Mandate—in response to the Delta variant of COVID-19. (ECF No. 69 at 123, 143-44).

   i.   *The First Mandate*

The August 30, 2021 First Mandate stated:

**After careful consideration, we have decided that all patient-facing and in-hospital employees and contingent workers must receive all required COVID vaccine doses[] by October 1 2021. This definition includes anyone who directly interfaces with patients and those who enter a hospital or healthcare facility as a part of their role.** *Examples include*, but are not limited to, *sales representatives*, clinical specialists, and members based at an Edwards facility who enter hospitals to support R&D, engineering and clinical projects.
[. . . .]
This vaccination requirement does not apply to employees and contingent workers in countries where it is prohibited by law to impose vaccination. *In countries like the United States, where vaccine requirements are permissible, reasonable accommodation will be provided for those who are unable to receive a COVID vaccine because of qualifying medical or religious reasons.*

In countries where vaccines are less available, or other requirements exist, our regional leaders and HR Business Partners will work with managers to institute alternate measures that optimize patient safety and healthcare provider safety, *which may include regular COVID testing or specific masking requirements*.

(ECF No. 69 at 123) (emphasis added in italics and bold italics). It is undisputed that this First Mandate applied to Washington. Washington declined a COVID-19 vaccine—explaining "I need to rely on the Holy Spirit that's telling me, 'Don't do this at this time.'" (ECF No. 69 at 33). Washington testified to her COVID-19 vaccination refusal:

> I'm not an antivaccine person. I have a lot of vaccines. I was a military kid. I probably have more vaccines than everybody else here because that's the responsible thing to do.
>
> I never had a reason to question it, but actually had people in my life that said, "Would you please look at this. This is different. Please just don't blindly do this." Well, okay.
>
> Well, first of all, it's not FDA approved. That's a big flag for me. I can't sell Edwards valves that aren't FDA approved. I can't even talk about them, legally.
>
> So that's a weird thing. The world is in a different place. We're in a new pandemic era, and I don't want to offend anybody either, because there are people who were praying for this, and this was an answer to their prayer. And that's great for them. I'm not God. I don't know everything, but I know what I need to do is go to him for answers.
>
> So I just did what Edwards taught me to do -- follow the legal -- excuse me -- the medical literature, the journals. Well, that's hard to find; right? It's brand new. So find what you can. I'm not just going to listen to the news. But I also was looking for, like, a product insert. Like all of Edwards heart valves come with this piece of paper. You fold it out. It's got tiny print. All the product inserts. You can't find that.
>
> So I didn't know what I was going to be putting in my body. And the more I dug, the more uneasy I became because I'm like, I'm supposed to risk everything and not know? So that is how I've gone about my life as a Christian to say, if I don't have peace about it, then I need to wait. That may not be never, but it's not right now.

(ECF No. 69 at 34-35). Washington testified these were her "heartfelt opinions." (ECF No. 69 at 35). In response, Edwards sought to accommodate Washington's refusal on COVID-19 vaccination with testing. (ECF No. 69 at 41). Washington refused to submit to nasal PCR testing—testifying that "the nasal [] went almost intracranial, and I was not comfortable doing that." (ECF No. 69 at 36). As to nasal PCR testing Washington asserted:

[Edwards's Counsel]: And you had a religious objection to PCR testing?

[Washington]: Invasive testing needlessly, yes.

[Edwards's Counsel]: [] And what about your religious beliefs or faith prohibit you from doing nasal swabs?

[Washington]: I'm not going to introduce a nasal swab -- and we can all get into, you know, particulars of how far does this go and that go -- but the PCR testing -- and you even grimaced when I mentioned it 'cause it goes way up into your brain. And who knows? Somebody's just -- I'm supposed to drive through CVS, and somebody's going to stick something up into my brain? No, thank you. That's just not wise.

(ECF No. 69 at 37-38). As an accommodation, Washington offered to (i) wear a mask; (ii) submit to a saliva PCR test; (iii) provide a daily health log; and (iv) take "prophylactic ivermectin." (ECF No. 69 at 38-39). As for ivermectin, Washington explained her understanding was that it (i) "was invented in the '70s;" (ii) "comes from Japan originally;" (iii) was used to treat river blindness;" and (iv) "is an antiviral medication used all over the world very inexpensively." (ECF No. 69 at 40). Washington testified she did not know whether ivermectin was FDA approved for COVID-19 purposes. (ECF No. 69 at 40).

Edwards granted Washington's accommodation—requiring her to (i) take twice weekly saliva PCR tests; (ii) wear an N95 mask; and (iii) complete twice-monthly account tracking for her assigned customers' COVID-19 requirements. (ECF No. 69 at 41-44). Edwards did not require Washington to become vaccinated against COVID-19 at this time. Edwards determined that such accommodations could be made "while also protecting patient safety, so long as those employees were still able to enter their assigned hospitals under the hospital's own COVID vaccine protocols." (ECF No. 69 at 120). One of Washington's assigned customer accounts—Baylor—did not permit exemptions from receiving a COVID vaccine, so Edwards reassigned that account from Washington to a different surgical sales representative. (ECF No. 69 at 45, 160).

*ii. The Second Mandate*

In Fall of 2021, Edwards determined that the COVID-19 Delta variant transmission "worsened, overwhelming many hospitals." (ECF No. 69 at 120). Ghosh explained in her declaration that:

> [A]s healthcare workers became increasingly burnt out and/or became ill themselves, a shortage of health care workers reached critical levels. Due to the staffing and bed shortages, elective operations and procedures were suspended or cancelled at hospitals around the U.S. ***This suggested a greater need to protect healthcare workers, in order to enable access for patients to Edwards's lifesaving products.***
> [. . . .]
> Additionally, in October 2021, new research was published showing that unvaccinated people were more likely to transmit the Delta variant than vaccinated people.
>
> [] To address these changing conditions and additional data and to maximize the protection of the health and safety of healthcare workers, Edwards announced an additional vaccine mandate policy on October 19, 2021, requiring all employees who directly interact with patients ***or who interact with healthcare professionals [] inside or outside the hospital setting to be fully vaccinated against COVID-19.***

(ECF No. 69 at 119-20) (emphasis added in bold italics). The October 19, 2021 Second Mandate stated:

> As previously announced, full COVID vaccination is required for all members of our team who directly interface with patients <u>and</u> those who enter hospitals and healthcare facilities as part of their role. Examples include. but are not limited to, sales representatives, clinical specialists, and those based at an Edwards facility who enter hospitals to support R&D, engineering and clinical projects.
>
> ***We have [] decided that our vaccine requirement must include all employees and contingent workers who directly interact with [a healthcare provider] at an Edwards facility or Edwards related location or event.***
> [. . . .]
> In countries like the United States, where vaccine requirements are permissible, reasonable accommodation will be provided for those who are unable to receive a COVID vaccine because of qualifying medical or religious reasons.

> In countries where vaccines are less available, or other requirements exist, our regional leaders and HR Business Partners will work with managers to institute alternate measures that optimize patient safety and healthcare provider safety, which may include regular COVID testing or specific masking requirements.

(ECF No. 69 at 143) (emphasis added in bold italics). Ghosh testified that this Second Mandate was focused, *inter alia*, on Edwards employees that met with health care workers outside of the hospital setting "where ventilation wasn't as good." (ECF No. 69 at 113). Regarding ventilated-area alternatives that would permit outside meetings, Ghosh testified Edwards "explore[d] other options[] but [. . .] couldn't find [options] that seemed reasonable and still provide[d] the level of safety." (ECF No. 60 at 117). With this more restrictive Second Mandate, Edwards reevaluated its previously granted accommodations for its employees:

> [Edwards] would consider whether those employees could perform the essential functions of their role without meeting HCPs outside of the hospital. If they could, the Company would remove those duties as a reasonable accommodation. *If meeting with HCPs outside the hospital was an essential function of the role, **the other possible accommodation was to search for other available roles within Edwards for which the employee was qualified and which did not require interactions with HCPs outside the hospital setting.***

(ECF No. 69 at 121) (emphasis added in italics and bold italics). Edwards determined that Surgical Sales Representatives—like Washington—could not safely perform their essential functions of their role without meeting healthcare providers outside of the hospital setting because meeting with healthcare providers outside of the hospital setting was essential for the role. (ECF No. 69 at 58-59, 119, 145-47). It is undisputed that the Second Mandate applied to Washington.

Washington again refused a COVID-19 vaccination and requested a second accommodation as follows: (i) to continue in her role as a sales representative and (ii) to meet with healthcare providers only inside hospitals while complying with her previous First Mandate accommodation requirements. (ECF No. 69 at 147). On December 21, 2021, Edwards's Human

Resources employee Marie Burgos responded that Edwards would not grant Washington's selected accommodations—instead, Edwards explained:

> Thus, if you remain unvaccinated, you will not be able to continue in your current role any longer as you can no longer perform the essential functions of your job without undue burden to Edwards. Your options are as follows:
> 1. Reconsider whether you are willing to get vaccinated.
> **2. If you are not willing to get vaccinated, as an alternative accommodation to your religious exemption, we can look for other roles within EW, for which you are qualified and do not fall under this mandate.**
> 3. If you are not interested in either of these, we would unfortunately need to move to separate employment.

(ECF No. 69 at 146) (emphasis added in bold). Washington chose the second option and identified several roles at Edwards, for which she believed (i) she was qualified and (ii) did not fall under the Second Mandate. (ECF No. 69 at 151-54). Edwards's Recruiter Chelle Wagner reviewed Washington's identified roles and determined Washington was either not qualified for the respective position or the role involved—as an essential role—meeting with healthcare providers outside of the hospital setting. (ECF No. 69 at 151). Washington and Edwards could not identify acceptable further work for Washington, and Edwards discharged Washington from work on January 21, 2022. (ECF No. 69 at 13, 74, 87). Washington contracted COVID-19 in late January 2022 and took ivermectin as a treatment. (ECF No. 69 at 41). Washington recovered from COVID-19. (ECF No. 69 at 41).

### C.  Procedural History

Washington initiated this litigation on November 14, 2022. (ECF No. 1). As amended, Washington asserted the following claims against Edwards: (i) religious discrimination, religious harassment, and religious retaliation in violation of Title VII; (ii) age discrimination and age-discrimination-retaliation in violation of the Age Discrimination in Employment Act (ADEA); and (iii) breach of contract. (ECF No. 34 at 12-15). On June 5, 2023, the Court entered an order that

instructed the Parties to take note of the Court's to-be adopted policies and procedures—effective July 1, 2023 and with hyperlinked attachment. (ECF No. 14). The Court promulgated its adopted policies and procedures by standing order on the Court's website on July 1, 2023. Both the hyperlinked attachment from June 5, 2023 and the July 1, 2023 adopted policies and procedures on the Court's website contain specific instructions regarding briefing requirements.

On December 7, 2023, Washington moved for affirmative summary judgment on her religious discrimination claim. (ECF Nos. 38-40). On February 5, 2024, Edwards filed its motion for summary judgment, which seeks dismissal of all of Washington's claims. (ECF Nos. 67-69). Washington moved to strike Edwards's motion for summary judgment and otherwise responded. (ECF Nos. 70, 73-75). In her response, Washington "withdraw[s] her claims for age discrimination, retaliation, and breach of contract." (ECF No. 74 at 9). Washington concedes her only remaining claims under Title VII are (i) her religious discrimination claim and (ii) her failure to accommodate religious observance claim. (ECF No. 74 at 9).[4] Therefore, **Washington's claims for age discrimination, retaliation, and breach of contract are DISMISSED**. Edwards replied on its motion for summary judgment. (ECF Nos. 71, 78).

The Court first addresses its concerns regarding Washington's briefing, (ECF Nos. 38-40; 73-75), and Washington's motion to strike Edwards's motion for summary judgment. (ECF No. 70). Thereafter, the Court addresses Washington's claims of (i) religious discrimination and (ii) failure to accommodate religious observance. Last, the Court discusses the various motion(s) to strike summary judgment evidence.

---

[4] Although Washington's pleading states "religious harassment" in line with her Title VII claims, Washington does not brief this assertion at any time in response to Edwards's motion for summary judgment, which seeks dismissal of all claims. (*See* ECF No. 67 at 1-2); (ECF No. 74). In light of her concession and complete lack of briefing, the Court determines Washington has withdrawn or abandoned her claim of "religious harassment." (ECF No. 74 at 9).

## II.    POLICIES, PROCEDURES, AND IMPROPER FILINGS

Federal courts are vested with the inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *See Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962). This authority is necessarily incident to the judicial power granted under Article III of the Constitution and includes the power of the court to control its docket. *See Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995). The Court's policies and procedures state under the Motion Practice heading: "[l]imit footnotes to only explanatory statements and dicta." (*See* ECF No. 14); Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, (January 10, 2025), https://www.txnd.uscourts.gov/judge/judge-ada-brown. The Court recognizes these policies and procedures—adopted by standing order—as a means of docket control.

As briefed, Washington's motion for summary judgment, (ECF No. 39), and response to Edwards's motion for summary judgment, (ECF No. 74), use *only* footnote citations for virtually all citations[5] to both law and the respective appendix. Washington has failed to comply with the Court's policies and procedures—standing order. As a consequence, the Court shall not consider those filings—(ECF Nos. 38-40; 73-75)—as properly filed and DENIES the respective relief requested. The Court shall not consider Washington's improperly filed briefing response to Edwards's summary judgment challenges. (*See* ECF No. 74). The Court declines to offer Washington leave to refile the same. The Court DENIES Washington's motion for oral argument as moot. (ECF No. 45).

---

[5] Washington's motion for summary judgment contains 110 footnote citations. (ECF No. 38). Washington's response to Edwards's motion for summary judgment contains 136 footnote citations. (ECF No. 74).

### III.    RULE 6 AND FILING DEADLINE

Washington moves to strike Edwards's motion for summary judgment—asserting it was filed late on January 6, 2024. (ECF No. 70, 72).[6] Edwards responds that its filing was timely under Federal Rule of Civil Procedure 6. (ECF No. 71).

Federal Rule of Civil Procedure 6 states:

(a) Computing Time. The following rules apply in computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time.
    (1) Period Stated in Days or a Longer Unit. When the period is stated in days or a longer unit of time:
        (A) exclude the day of the event that triggers the period;
        **(B) count every day, including intermediate Saturdays, Sundays, and legal holidays; and**
        **(C) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.**

Fed. R. Civ. P. 6(a) (emphases added in bold). Here, the Court extended the dispositive motion deadline to February 4, 2024—a Sunday. Under the Court's time computation pursuant to Rule 6, the dispositive motion deadline was February 5, 2024—the date Edwards filed its motion for summary judgment. (*See* ECF Nos. 68-69). The Court determines Edwards's motion for summary judgment was timely filed. (*See* ECF Nos. 68-69); Fed. R. Civ. P. 6(a). For those reasons, the Court DENIES Washington's objection and motion to strike Edwards's motion for summary judgment. (ECF No. 70).

---

[6] Washington's motion to strike based on computation of time does not use footnotes for citations—using instead only in-line citations. (ECF No. 70).

## IV.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and draw all reasonable inferences in the light most favorable to a party opposing a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 254-55. Moreover, the evidence the nonmovant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The evidence must be such that a jury could reasonably find in the nonmovant's favor. *Anderson*, 477 U.S. at 248. If the nonmovant is unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The moving party bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (i) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (ii) arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative

defense. *Celotex*, 477 U.S. at 322–25. There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. . . . "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458.[7] Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

> [i]f a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of

---

[7] As a consequence of Washington's improper briefing, (ECF Nos. 39, 74), the Court declines to "sift through" her corresponding appendices, (ECF Nos. 40, 75). *See Ragas v. Tenneco Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2)-(3).

## V.    WASHINGTON'S RELIGIOUS DISCRIMINATION CLAIM

"A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see*, *e.g.*, *Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012) (addressing racial discrimination). Regarding direct evidence, the Fifth Circuit has explained:

Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption.... It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action.

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). Here, Washington presents no direct evidence on any of her claims. "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Circumstantial evidence includes statements that merely suggest discriminatory motive or require the fact finder to draw an inference as to whether the comment is probative of an employer's discriminatory animus. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896-98 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003). The Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

Under that framework, [a plaintiff] must make out a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If she succeeds, [a defending employer] must respond with a "legitimate, nondiscriminatory reason" for terminating [the plaintiff]. *Id.* at 282. Then the burden shifts back to [the plaintiff], who must counter with substantial evidence that [the defending employer's] proffered reason is pretextual. *Id.*

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The second step of the *McDonnell Douglas* framework requires an employer's *production* of a legitimate, nondiscriminatory reason for terminating a plaintiff, but this second step "can involve no credibility assessment." *Reeves*, 530 U.S. 133, 142 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).[8] Regarding the third step of the *McDonnell Douglas* framework, "the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804).

Title VII prohibits an employer from discriminating against an employee on the basis of her religion. *See* 42 U.S.C. §§ 2000e-2(a)(1), 2000e(j). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief[.]" 42 U.S.C. § 2000e(j). The Fifth Circuit has explained:

> To establish a prima facie case of religious discrimination under Title VII, the plaintiff must present evidence that **(1)** she held a bona fide religious belief, **(2)** her belief conflicted with a requirement of her employment, **(3)** her employer was informed of her belief, and **(4)** she suffered an adverse employment action for failing to comply with the conflicting employment requirement.

*Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014) (block quoting *Tagore v. United States,* 735 F.3d 324, 329 (5th Cir. 2013) (citing *Bruff v. N. Miss. Health Servs., Inc.,* 244 F.3d 495, 499 n. 9 (5th Cir. 2001)); *see also, e.g.*, *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000) (discussing the same four elements).

---

[8] Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

### A. Edwards's "Similarly Situated" Argument

Edwards first challenges whether evidence exists of a "similarly situated comparator who received more favorable treatment under nearly identical circumstances." (ECF No. 68 at 37-39). However, whether a similarly situated comparator exists is not an element of a prima facie of religious discrimination under Title VII. *Davis*, 765 F.3d at 485; *Weber*, 199 F.3d at 273. The Court pretermits further discussion of this argument as unnecessary. As to this claim of religious discrimination, the Court assumes without deciding that Washington met her prima facie burden.

### B. Whether Evidence of Pretext Exists

Assuming *arguendo* that Washington showed a prima facie case of religious discrimination, the Court moves to the second step of the *McDonnell Douglas* framework— whether Edwards produced a legitimate, nondiscriminatory reason for terminating Washington. *Reeves*, 530 U.S. 133, 142. The summary judgment evidence includes a legitimate, nondiscriminatory reason for terminating Washington's employment. *Owens*, 33 F.4th at 825-27, 835 (discussing pretext in the discrimination and retaliation contexts). Here, Edwards produced evidence of one overarching reason for the termination—Washington refused to comply with the Second Mandate's COVID-19 vaccination requirement and Edwards could not secure further work with Washington. Next, under the third step of the *McDonnell Douglas* framework, Washington must counter this evidence regarding the Second Mandate and Edwards's inability to secure further work with "substantial evidence" for the termination as pretextual. *See Owens*, 33 F.4th at 825-27; *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011). For pretext in the discrimination context, the Fifth Circuit has explained:

> The plaintiff must rebut each nondiscriminatory reason articulated by the employer. *Wallace*, 271 F.3d at 220. A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence." *Id.*; *Reeves*, 530 U.S. at 143, 120

S.Ct. at 2106. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).

*Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (addressing discrimination claims under Title VII and the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978).

The Court first addresses disparate treatment, which "occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct." *Vaughn*, 665 F.3d at 637. In discussing whether an employee is "similarly situated" in the employment context, the Fifth Circuit has explained:

> employees are generally not similarly situated if they have different supervisors, different work responsibilities, work for different divisions of a company, committed dissimilar violations, or were the subject of adverse employment actions too remote in time from that taken against the plaintiff. *See id.* at 259–60. Furthermore, if the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* at 260[].

*Cardiel v. Apache Corp.*, 559 Fed. Appx. 284, 288 (5th Cir. 2014) (parenthetical citation omitted, not designated for publication) (addressing the fourth element of a discrimination claim based on race, age, and disability) (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009). "The similarly situated employee is known as a comparator." *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022) (addressing gender discrimination claim under Title VII).

Washington presents no evidence of disparate treatment. Washington testifies that a number of "critical care rep[s]." "banded together" to refuse the COVID-19 vaccination. (ECF No. 69 at 54-55). But the record contains no further evidence about these critical care reps: (i) as to

their reason(s) for refusing the COVID-19 vaccination, (ii) whether they refused the vaccination due to a religious belief, (iii) whether they were Christian, or (iv) whether they fell under the Second Mandate. Additionally—Washington testified that (i) these "critical care reps" sold a different technology than Washington, (ii) were a part of a different division, and (iii) had different supervisors. (ECF No. 69 at 55-57). The record shows that none of Washington's proffered employees were "similarly situated" to Washington. *Cardiel*, 559 Fed. Appx. at 288. The record further contains no evidence that Edwards treated Washington more harshly than another similarly situated employee for nearly identical conduct—refusing to comply with the Second Mandate's COVID-19 vaccination requirement and failing to secure further work as offered.

The Court next addresses whether summary judgment evidence exists that shows Edwards's explanation for the work separation was false or unworthy of credence—such that a genuine issue of material fact exists. Regarding whether an employer's explanation is false or unworthy of credence—"[an explanation] cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (emphasis in original). Washington presents no evidence that Edwards's explanation for her termination is false or unworthy of credence. *Laxton*, 333 F.3d at 578; *Hicks*, 509 U.S. at 515. No evidence in the record shows Edwards's reason for the termination was false, and nothing in the record demonstrates any discriminatory animus from Edwards. No evidence shows religious discrimination was the real reason for the separation. To the contrary, the summary judgment evidence shows Edwards took no issue with Washington's religiosity or Christian faith:

> [Edwards's Counsel]: Do you consider yourself a religious person?
>
> [Washington]: I don't want to -- I don't want to be rude. Yes. This is all about religious, ma'am.
>
> [Edwards's Counsel]: Is that something that you make known to other people?

[Washington]: I wear a cross almost every day. That was something I discussed in my territory. I've been given awards. I've been sales rep of the year twice. I have spoke from the stage. I thank the Lord for that blessing all -- all the time. I don't -- I believe that most of the time that I was at Edwards, that was fine.

(ECF No. 69 at 67-68). Although Washington avers generally that she thought "some people" were offended by her religiosity, she could not name any of those people. (ECF No. 69 at 68). Nothing in the summary judgment evidence shows the decisionmakers in Edwards's termination of Washington held any discriminatory animus of any kind. *See Russell*, 235 F.3d at 227 (citing *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000)); *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 478 (5th Cir. 2015) (discussing pretext in the context of a decisionmaker that made comments relating to age consequent to an age discrimination claim).

In reply, Edwards raises a mixed-motive analysis of pretext. (ECF No. 78 at 17-19).[9] The Fifth Circuit "has adopted use of a 'modified *McDonnell Douglas* approach' in cases where the mixed-motive analysis may apply." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005). The modified *McDonnell Douglas* approach differs from the traditional *McDonnell Douglas* approach after (i) the plaintiff has made a prima facie showing and (ii) defendant has responded with a legitimate, nondiscriminatory reason for the adverse employment action. *Keelan*, 407 F.3d at 341.

[T]he plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) **that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative**).

---

[9] Though the Court does not consider Washington's improperly filed briefings, (ECF Nos. 39; 55; 74)—Washington does not brief a mixed motive in the context of a pretext analysis at any time.

*Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal quotation marks and citations omitted) (emphasis added in bold). The *Rachid* Court further recognized:

> "A mixed-motives case arises when an employment decision is based on a mixture of legitimate and illegitimate motives. [. . .] If the employee proves the unlawful reason was a motivating factor, the employer must demonstrate that it would have taken the same action in the absence of the impermissible motivating factor."

*Rachid*, 376 F.3d at 309–10 (quoting *Louis v. E. Baton Rouge Parish Sch. Bd.*, 303 F.Supp.2d 799, 801–04 (M.D. La. 2003)) (citing *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 553 (10th Cir. 1999) (noting that a mixed-motives analysis applies "where the evidence is sufficient to allow a trier to find both forbidden and permissible motives.") (quotations and citations omitted)). As discussed above, the summary judgment evidence contains no evidence of any discriminatory animus or illegitimate motive from Edwards with regard to the termination. *See Rachid*, 376 F.3d at 309–10. The record contains no competent summary judgment evidence of religious discrimination as a motivating factor in Washington's discharge. Thus, Washington has not met her pretext burden under the mixed-motive analysis.

For those reasons, the Court determines Washington has not met her burden under the third step of the *McDonnell Douglas* framework involving pretext. The summary judgment evidence does not establish a genuine issue of material fact as to this third step, and Washington has not rebutted Edwards's explanation for terminating Washington with "substantial evidence" for the termination as pretextual nor shown any discriminatory mixed-motive. *See Owens*, 33 F.4th at 825; *see also Vaughn*, 665 F.3d at 637. The Court GRANTS Edwards's motion for summary judgment on Washington's religious discrimination claim.

### C. Disparate Treatment Based on Religion

It is unclear whether Washington asserted either a separate claim or theory of liability of disparate treatment based on religion. (*See* ECF No. 34 at 12). A plaintiff may assert a claim for religious discrimination under a disparate treatment theory. The Fifth Circuit has explained:

> *"**Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's** race, color, **religion**, sex, or national origin. In such disparate-treatment cases, proof and finding of discriminatory motive is required." Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). A plaintiff can prove discriminatory motive through either direct or circumstantial evidence. *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994). When a plaintiff builds a case on circumstantial evidence, a court analyzes the plaintiff's claim under the *McDonnell Douglas* framework. *See Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination." *Id.*

*Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (emphasis added in italics and bold italics). For a plaintiff to meet the prima facie step of a disparate treatment claim, the Fifth Circuit has explained:

> a plaintiff must show he or she was: (**1**) a member of a protected class; (**2**) qualified for the position held; (**3**) subject to an adverse employment action; and (**4**) treated differently from others similarly situated. *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001).

*Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005) (addressing disparate treatment in race or national origin context); *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001) (addressing disparate treatment in race or national origin context).

Although Washington's briefing block quotes a case that discusses disparate treatment,[10] Washington does not apply any disparate treatment analysis to her case. (*See* ECF No. 74). In reply, Edwards is confused as to whether Washington asserted a claim of disparate treatment based

---

[10] *See Hebrew v. Tex. Dep't of Criminal Justice*, 80 F.4th 717, 724 (5th Cir. 2023).

on religion, but Edwards briefs this claim, nonetheless. (ECF No. 78 at 11-19). Out of an abundance of caution, the Court addresses *arguendo* Washington's disparate treatment claim.

First—Washington has either withdrawn her claim for disparate treatment based on religion or abandoned that claim because (i) Washington fails to brief disparate treatment as applied to the facts and circumstances of this case in her response, (ECF No. 74),[11] and (ii) Washington concedes her only remaining claims were for religious discrimination and failure to accommodate religious observance. (ECF No. 74 at 9). Second—assuming *arguendo* that Washington properly asserted a disparate treatment claim and did not withdraw or abandon the same—the Court would reach the same result as with her religious discrimination claim: dismissal.

A disparate treatment claim uses the same three-step *McDonnell Douglas* framework as described above, and the same pretext analysis would apply to the third step of a disparate treatment claim. *Cicalese*, 924 F.3d at 766. The Court assumes without deciding that Washington met the prima facie elements of a disparate treatment claim. The Court has discussed Edwards's legitimate, nondiscriminatory reason for discharging Washington. *Owens*, 33 F.4th at 825. Next, no evidence—nor "substantial evidence"—of pretext shows Edwards's explanation for discharging Washington was false or unworthy of credence. *See Owens*, 33 F.4th at 825-27. No evidence of any discriminatory mixed-motive exists in the summary judgment evidence. Thus, assuming *arguendo* Washington properly asserted a claim for disparate treatment and met each corresponding prima facie element, Washington cannot meet her burden under the third step of the *McDonnell Douglas* framework. *Cicalese*, 924 F.3d at 766. No genuine issue of material fact exists as to pretext—whether analyzed under the general pretext or the mixed-motive standards.

---

[11] Washington does not brief disparate treatment in her affirmative motion for summary judgment. (ECF No. 39).

Consequently, the Court GRANTS summary judgment as to Washington's disparate treatment based on religion claim.

## VI.   WASHINGTON'S FAILURE TO ACCOMMODATE RELIGIOUS OBSERVANCE CLAIM

"An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship." *Weber*, 199 F.3d at 273. The court analyzes a Title VII claim for a failure to accommodate religious observance under a burden-shifting framework akin to the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas*, 411 U.S. at 804; *see generally Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("To succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a prima facie case of discrimination.") (collecting cases); *see, e.g.*, *Balderas v. Valdez*, No. 16-CV-2652-D, 2018 WL 3570096, at *2 (N.D. Tex. July 25, 2018) (discussing the same). The employee must first establish a prima facie case of religious discrimination. *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).

Once the plaintiff in a religious discrimination case makes out a prima facie case, "the burden shifts to the defendant to demonstrate either [(i)] that it reasonably accommodated the employee, or [(ii)] that it was unable to reasonably accommodate the employee's needs without undue hardship." *Antoine*, 713 F.3d at 831. Because Edwards will have the burden of proving undue hardship at trial, to obtain summary judgment, it "must demonstrate, without genuine and material factual dispute, and as a matter of law, that [Edwards was] unable to reasonably accommodate [Washington's] religious beliefs      without      incurring      undue hardship." *Ford v. City of Dallas, Tex.*, 2007 WL 2051016, at *1 (N.D. Tex. July 12, 2007). "[U]ndue hardship is shown when a burden is substantial in the overall context of an employer's

business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (quotation marks omitted). The Court next addresses the challenged elements of Washington's prima facie case and whether Edwards met the second step of this failure to accommodate analysis.

### A. Whether Washington Held a Bona Fide Religious Belief

Edwards challenges the first element of her prima facie claim—whether Washington held a bona fide religious belief. *See Davis*, 765 F.3d at 485. The Fifth Circuit has explained that:

> Bona fide religious beliefs include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." *See, e.g.,* 29 C.F.R. § 1605.1 (citing *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)). **A court's inquiry is limited to focusing upon the individual's motivation. Specifically, a court's task is to decide "whether [the individual's beliefs] are,** *in his own scheme of things,* **religious."** *Seeger,* 380 U.S. at 185, 85 S.Ct. 850 (emphasis added). In this regard, a belief is "religious" if it is "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by ... God." *Seeger,* 380 U.S. at 176, 85 S.Ct. 850. Conversely, whether the belief itself is central to the religion, i.e., whether the belief is a true religious tenet, is "not open to question." *Moussazadeh v. Tex. Dep't of Criminal Justice,* 703 F.3d 781, 790 (5th Cir.2012) (quoting *Seeger,* 380 U.S. at 185, 85 S.Ct. 850) (internal quotation marks omitted) (discussing the threshold inquiry into a person's religious belief under the Religious Land Use and Institutionalized Persons Act); *see Tagore,* 735 F.3d at 328–29 (applying *Moussazadeh* to a Title VII religious discrimination claim).
>
> **The sincerity of a person's religious belief is a question of fact unique to each case.** *Tagore,* **735 F.3d at 328;** *Moussazadeh,* **703 F.3d at 791 ("This is doubly true regarding sincerity.").** "The specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's 'sincerity' in espousing that practice is largely a matter of individual credibility." *Tagore,* 735 F.3d at 328; *see also Moussazadeh,* 703 F.3d at 791 ("[T]he important inquiry was what the prisoner claimed was important to him." (alteration in original) (citation and internal quotation marks omitted)).
>
> **This court has cautioned that judicial inquiry into the sincerity of a person's religious belief "must be handled with a light touch, or judicial shyness."** *Tagore,* **735 F.3d at 328 (citation and internal quotation marks omitted).** "[E]xamin[ing] religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread." *Id.* (alteration in original) (citation and internal quotation marks omitted). Indeed, "the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged," and

"claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions." *Id.*

*Davis*, 765 F.3d at 485–86 (emphasis added in bold).

Edwards asserts that evidence that a plaintiff has acted "inconsistently with her stated religious beliefs is evidence the religious observances 'are based on [her] personal preferences and not a sincerely held religious belief.'" (ECF No. 68 at 42) (citing *Lorenz v. Wal-Mart Stores, Inc.*, No. SA05CA0319 OG (NN), 2006 WL 1562235, at *9 (W.D. Tex. May 24, 2006), *subsequently aff'd sub nom. Lorenz v. Wal-Mart Stores*, 225 Fed. Appx. 302 (5th Cir. 2007). Edwards asserts that Washington's objection to taking the COVID-19 vaccine was because she did not know "what was in it" and was not "FDA approved" but that she volunteered to take (and ultimately took) ivermectin while also *not* knowing ivermectin's FDA approval status or what was in ivermectin. (*See* ECF No. 69 at  33-35, 38-39, 41). Nonetheless, Washington also testified that her refusal to submit to COVID-19 vaccination was a "heartfelt opinion[]." (ECF No. 69 at 35).

The Court declines to conduct an inquiry as to the sincerity of Washington's religious beliefs regarding the COVID-19 vaccination. *Davis*, 765 F.3d at 485–86. The Court assumes without deciding that Washington held a bona fide religious belief that prohibited her from submitting to the COVID-19 vaccination requirement of the Second Mandate. Edwards does not challenge any other element of Washington's prima facie showing for religious discrimination in its argument on this failure to accommodate religious observance claim. (*See generally* ECF Nos. 68; 78). The Court determines that in the context of a failure to accommodate a religious observance claim, Washington has made a prima facie case of religious discrimination. *Antoine*, 713 F.3d at 831.

### B. Whether Edwards Reasonably Accommodated Washington

Edwards next asserts it reasonably accommodated Washington's refusal to vaccinate under

the Second Mandate. The Fifth Circuit has explained:

> "An employer has the statutory obligation to make reasonable accommodations for
> the religious observances of its employees, but it is not required to incur undue
> hardship." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000). "Title
> VII does not restrict an employer to only those means of accommodation that are
> preferred by the employee." *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501
> (5th Cir. 2001). **Once an employer has established that it offered a reasonable
> accommodation, even if that alternative is not the employee's preference, it
> has satisfied its obligation under Title VII as a matter of law.** *Id.* **The
> employer's offer of a reasonable accommodation triggers an accompanying
> duty for the employee: "An employee has a duty to cooperate in achieving
> accommodation of his or her religious beliefs, and must be flexible in achieving
> that end."** *Id.* **at 503.**

*Horvath v. City of Leander*, 946 F.3d 787, 791 (5th Cir. 2020), as revised (Jan. 13, 2020) (emphasis

added in bold). A plaintiff has the "burden of establishing that reasonable accommodation is

possible[.]" *Chandler v. City of Dallas*, 2 F.3d 1385, 1395 (5th Cir. 1993), *holding modified by*

*Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002). "[T]he employee's duty, inherent in

the employment relationship, to attempt to accommodate [her] beliefs himself and to cooperate

with attempts at reasonable accommodation by [her] employer." *Brener v. Diagnostic Ctr. Hosp.*,

671 F.2d 141, 145 (5th Cir. 1982) (internal quotation omitted) (discussing religious discrimination

claim).[12]

---

[12] The Fifth Circuit further explained:

> cases confirm what the statute's use of the term "reasonable" suggests: ***bilateral cooperation is
> appropriate in the search for an acceptable reconciliation of the needs of the employee's religion
> and the exigencies of the employer's business***. Although the statutory burden to accommodate rests
> with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his
> needs through means offered by the employer. ***A reasonable accommodation need not be on the
> employee's terms only***.

*Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145–46 (5th Cir. 1982) (emphasis added in bold italics).

---

Edwards asserts that it met its Title VII obligation to make a reasonable accommodation of Washington's religious belief when it offered her assistance in finding another position at Edwards that would not conflict with her religious observance under the Second Mandate. (ECF No. 68 at 44-45). The summary judgment evidence shows Edwards: (i) provided two weeks of assistance to Washington in offering her further work, (ECF No. 69 at 74-77, 79-80); (ii) assigned a recruiter to Washington to assist her in finding further work, (ECF No. 69 at 149-154); (iii) reviewed positions Washington found at Edwards, (ECF No. 69 at 149-154); (iv) explained why Washington was not qualified for her selected positions, (ECF No. 69 at 66-67, 149-154); and (v) continued to search and communicate its desire to transfer Washington to another job at Edwards during that period, (ECF No. 69 at 158-162). Edwards directs the Court to *Bruff v. North Mississippi Health Services, Incorporated* in arguing that its actions of offering and assisting Washington with further work constituted a reasonable accommodation. 244 F.3d at 501-03. In *Bruff* the Fifth Circuit addressed a failure to accommodate religious observance claim raised under Title VII. The *Bruff* employer gave the employee:

> 30 days, and the assistance of its in-house employment counselor, to find another position at the Center where the likelihood of encountering further conflicts with her religious beliefs would be reduced fulfilled its obligations to offer her a reasonable accommodation.
> [. . .]
> When the Medical Center gave Bruff 30 days to find another position, it also alerted its in-house employment counselor to the situation and directed that Bruff be given assistance in that effort.[] The record reflects that Bruff was advised of, and applied for, another counselor position. Although she was not successful, the Medical Center was not obligated to give Bruff preference over others with superior credentials when filling the Psychiatric Assessment Counselor position.

244 F.3d at 501 (footnote omitted). The *Bruff* Court determined the employer had made a reasonable accommodation to that employee. 244 F.3d at 503.

In her testimony, Washington repeatedly avers that Edwards failed to act in "good faith in helping [her] find another job." (ECF No. 69 at 79-80). However, no Party directs the Court to a "good faith" requirement for a reasonable accommodation of religious beliefs under Title VII, and the Court has found none. Otherwise, Washington's testimony shows Edwards refused to meet her preference(s) in work accommodation—which Edwards was not required to afford as the *only* reasonable accommodation. *Horvath*, 946 F.3d at 791; (*see* ECF No. 69 at 79-80; 87).

The Court must conclude that—as in *Bruff*—Edwards has shown that it offered a reasonable accommodation to Washington in offering and assisting Washington in securing further work. 244 F.3d at 503. The summary judgment evidence does not show a genuine issue of material fact as to whether Edwards reasonably accommodated Washington's religious belief. Edwards has met its statutory burden under Title VII as a matter of law. *Horvath*, 946 F.3d at 791; *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) ("[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end.").[13] The Court GRANTS Edwards's motion for summary judgment on Washington's failure to accommodate religious observance claim.

### C.  Whether Edwards Has Shown Undue Hardship on the Conduct of its Business

Assuming *arguendo* Edwards had not reasonably accommodated Washington's religious observance, the Court next considers whether Edwards has shown undue hardship on the conduct of its business. Edwards refers the Court to the Supreme Court's opinion in *Groff v. DeJoy* in its

---

[13] *See generally Hebrew v. Tex. Dep't of Criminal Justice*, 80 F.4th 717, 723 (5th Cir. 2023) (explaining no reasonable accommodation was made to employee's religious observance of keeping a long beard). The Court notes that, unlike in *Hebrew*—where the Fifth Circuit discussed, *inter alia*, an employer's avoidance of an accommodation— Edwards actively supported the accommodation of offering further work over several weeks and repeated efforts. *Compare Hebrew*, 80 F.4th at 723 *with Bruff v. N. Miss. Health Servs., Inc.,* 244 F.3d 495, 501-03 (5th Cir. 2001).

argument that it met the undue hardship requirement under Title VII. 600 U.S. at 468. In *Groff*,

the Supreme Court explained:

> **Here, the key statutory term is "undue hardship." In common parlance, a "hardship" is, at a minimum, "something hard to bear."** Random House Dictionary of the English Language 646 (1966) (Random House). Other definitions go further. See, *e.g.*, Webster's Third New International Dictionary 1033 (1971) (Webster's Third) ("something that causes or entails suffering or privation"); American Heritage Dictionary 601 (1969) (American Heritage) ("[e]xtreme privation; adversity; suffering"); Black's Law Dictionary, at 646 ("privation, suffering, adversity"). But under any definition, a hardship is more severe than a mere burden. So even if Title VII said only that an employer need not be made to suffer a "hardship," an employer could not escape liability simply by showing that an accommodation would impose some sort of additional costs. Those costs would have to rise to the level of hardship, and adding the modifier "undue" means that the requisite burden, privation, or adversity must rise to an "excessive" or "unjustifiable" level. Random House 1547; see, *e.g.*, Webster's Third 2492 ("inappropriate," "unsuited," or "exceeding or violating propriety or fitness"); American Heritage 1398 ("excessive"). The Government agrees, noting that "'undue hardship means something greater than hardship.'" Brief for United States 30; see *id.*, at 39 (arguing that "accommodations should be assessed while 'keep[ing] in mind both words in the key phrase of the actual statutory text: "undue" and "hardship"'" (quoting *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 456 (C.A.7 2013)).
>
> [. . . .]
>
> **[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, "size and operating cost of [an] employer."**
>
> [. . . .]
>
> **we think it appropriate to leave it to the lower courts to apply our clarified context-specific standard, and to decide whether any further factual development is needed.**

600 U.S. at 468-71, 473 (emphasis added in bold).

As shown above, Edwards implemented and evaluated these mandates as methods to

protect its patient and healthcare worker customers from COVID-19 by reducing its spread. (ECF

No. 69 at 108-09, 119-20, 178). This Court has entered opinions relating to COVID-19 and

respective employment accommodations to work mandates or exemptions in two of its prior cases

and takes judicial notice of the same. *Sanchez v. Brown*, No. 3:20-CV-00832-E, 2020 WL 2615931

(N.D. Tex. May 22, 2020) (addressing spread of COVID-19 inside the Dallas County Jail in the context of various 42 U.S.C. § 1983 claims); *Hicks v. Baylor Univ. Med. Ctr. Dallas*, No. 3:22-CV-00072-E, 2024 WL 3513471 (N.D. Tex. July 22, 2024) (addressing employment accommodation(s) under the ADA in the context of a COVID-19 exemption). The summary judgment evidence shows that permitting Washington to work unvaccinated under the Second Mandate would have increased the likelihood of COVID-19 transmission among Edwards's customers,[14] which could have resulted in the illness or death of its customers. (ECF No. 69 at 41, 108-09, 118-20, 178). Given the context of Edwards—a medical device merchant whose employees interact with (i) at-risk patients and (ii) healthcare workers—the Court determines that the summary judgment evidence shows undue hardship on the conduct of its business.[15] The Court GRANTS Edwards's motion for summary judgment on Washington's failure to accommodate religious observance claim.

## VII.    MOTIONS TO STRIKE

The Parties have objected to and moved to strike several portions of the submitted appendices. (ECF Nos. 56; 76; 84). As one court in the Northern District has discussed in the context of a motion to strike summary judgment evidence:

> Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527,

---

[14] Washington testified she contracted COVID-19 at "the airport" in January 2022. (ECF No. 69 at 41).

[15] *See generally Hebrew v. Tex. Dep't of Criminal Justice*, 80 F.4th 717, 722-23 (5th Cir. 2023) ("TDCJ nowhere identifies any actual costs it will face—much less "substantial increased costs" affecting its entire business—if it grants this one accommodation [allowing an employee to keep a long beard].").

1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). . . . . "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

*Appel v. Inspire Pharms., Inc.*, 712 F. Supp. 2d 538, 542 (N.D. Tex. 2010), *aff'd*, 428 F. App'x

279 (5th Cir. 2011). As another court in the Northern District has discussed in determining

summary judgment:

> The court in deciding [movant's] motion will not take into account summary judgment evidence that [movant] has not cited in the manner required—that is, to each page of the appendix that supports each assertion that the party makes concerning the evidence. "Otherwise, [Rule 56.5(c)] would not mean what [it] say[s]." *See Andrews v. CompUSA, Inc.*, 2002 WL 265089, at *3 (N.D.Tex. Feb.21, 2002)( Fitzwater, J.). The court will not undertake a search of the appendix for evidence that would be sufficient to grant summary judgment in [movant's] favor.

> The court is not required to "comb the record" in search of summary judgment evidence. *See Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir.1996) (citing *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir.1996)). "Nor will the court overlook Rule 56.5(c), a valuable tool for busy trial courts that requires a party to place an issue clearly in focus by citing in its brief *each* page of the appendix that supports *each* assertion that it makes concerning the summary judgment evidence." *Andrews*, 2002 WL 265089 at *3.

*Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, No. CIV.A. 398CV2996D, 2002 WL 1751381, at *9

(N.D. Tex. Apr. 4, 2002). This Court agrees with the *Appel* and *Aspex Eyewear, Inc.* Courts'

reasoning and applies the same standards to the Parties in this case. *See Appel*, 712 F. Supp. 2d at

542; *Aspex Eyewear*, 2002 WL 1751381, at *9. The Court has not considered any evidence that

did not meet these standards. The Court DENIES the respective motions to strike. (ECF Nos. 56;

76; 84). As the Court has considered all of the competent summary judgment evidence before it—

without striking any evidence—there is no evidence that shows a genuine issue of material fact

exists in support of Washington's claims. That is, even without striking evidence, nothing in the record creates a genuine issue of material fact that would preclude Edwards's motion for summary judgment. The Court DENIES the consequent motion to file sur-reply as moot. (ECF Nos. 59; 62; 63).

## VIII.    CONCLUSION

Washington has withdrawn all of her claims except the religious discrimination and failure to accommodate religious observance claims addressed above. (ECF No. 74 at 9). For the reasons enumerated above, the Court GRANTS Edwards's motion for summary judgment on all of Washington's remaining claims. (ECF Nos. 67-69). The Court DENIES Washington's Motion for Partial Summary Judgment, (ECF No. 38). The Court DENIES all of the remaining, non-dispositive motions. (ECF Nos. 45; 70; 56; 59; 62; 63; 76; 84). The Court DISMISSES all of Washington's claims. The Court shall follow with a final judgment. *See* Fed. R. Civ. P. 54; Fed. R. Civ. P. 58.

**SO ORDERED.**

13th day of February, 2025.

ADA BROWN
UNITED STATES DISTRICT JUDGE